IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

LEE HUNT, as the personal representative
of the wrongful death estate of SALLYANN
ULIBARRI, and DIANE LOPEZ, as the legal
guardian of G. ULIBARRI, a minor,

      Plaintiffs,

      v.                                        Civil No. 22-00278 WJ-JFR

THE SIEGEL GROUP NEVADA, INC.,
a Nevada corporation, 75 HOTEL CIRCLE
HOLDINGS, LLC, d/b/a SIEGEL SUITES NEW
MEXICO, LLC, a Nevada limited liability
company, TAMMY KIMBALL, JOSEPH
POUGES, and STEPHEN SIEGEL,

      Defendants.

## MEMORANDUM OPINION AND ORDER
## GRANTING PLAINTIFFS' MOTION TO REMAND

THIS MATTER comes before the Court upon Plaintiffs' Motion to Remand, filed April 28, 2022 **(Doc. 5).**[1] Having reviewed the parties' submissions and the applicable law, the Court finds that Plaintiffs' motion is meritorious; therefore, the above-captioned case is remanded back to state.

### BACKGROUND

This is a wrongful death case. Siegel Suites Albuquerque ("Siegel Suites") is a set of apartments located in Albuquerque, at 75 Hotel Circle, NE. In December 2018, Sallyann Ulibarri ("Sallyann") checked in there for a four-week stay. According to the First Amended Complaint ("complaint," *see* Doc. 1-4), Defendants knew that Siegel Suites was a target for extensive criminal activity, and that local police regularly conducted searches for individuals with

---

[1] Separate responses were filed by Stephen Siegel ("Siegel") and The Siegel Group ("Defendants," collectively).

outstanding warrants who were staying there. In particular, Defendants were aware of domestic disturbances caused by Orlando Johnson ("Orlando") against Sallyann that were occurring on the premises of Siegel Suites. Management at Siegel Suites allegedly noticed that Sallyann was consistently developing fresh bruising, cuts and associated injuries at the hands of Orlando and were also aware that he disturbed and disrupted other Siegel Suites tenants by making threatening gestures and language. *Id.*, ¶¶30-35.

On January 6, 2019, Sallyann was beaten to the point of unconsciousness at the hands of Orlando on the premises of Siegel Suites Albuquerque, and died two days later. Plaintiffs assert that Defendants could have but did not, increase patrols of public areas or install additional security measures sufficient to reasonably ensure that potential criminal activity was intercepted and prevented. Doc. 1-2, ¶¶20-29. The complaint was filed on December 6, 2019 in the First Judicial District in Santa Fe, New Mexico complaint for wrongful death, loss of consortium and violations of the New Mexico Unfair Trade Practices Act. Doc. 1-4. It was removed by Defendant Siegel on April 14, 2022 on the grounds of diversity jurisdiction.

Plaintiffs allege that Defendants created a dangerous environment at Siegel Suites and failed to implement sufficient measures to reasonably protect the safety and wellbeing of tenants, including Sallyann. The First Amended Complaint (Doc. 1-4) contains three counts against all Defendants:

> Count I: Negligent and reckless security resulting in severe injury and death;
> Count II: Loss of Consortium; and
> Count III: Violations of New Mexico's Unfair Trade Practices Act

**I.   Legal Standards**

   A.   <u>Removal</u>

Federal courts are courts of limited jurisdiction and must have a statutory basis for their jurisdiction." *Dutcher v. Matheson*, 733 F.3d 980, 984 (10th Cir. 2013). To remove a case to federal court, the "defendant seeking removal must establish that federal court jurisdiction is proper by a preponderance of the evidence." *Aguayo v. AMCO Ins. Co.*, 59 F.Supp.3d 1225, 1250 (D.N.M. 2014).[2] 28 U.S.C. § 1332(a)(1) provides that federal district courts have subject-matter jurisdiction over civil matters when the matter in controversy is between "citizens of different parties" and the amount in controversy exceeds $75,000. To successfully remove a case based on §1332(a)(1), the defendant must establish by a preponderance of the evidence that complete diversity exists. *Dutcher v. Matheson*, 733 F.3d 980, 987 (10th Cir. 2013).

B.  <u>Fraudulent Joinder</u>: "A defendant may remove a case to federal court based upon diversity jurisdiction in the absence of complete diversity if a plaintiff joins a nondiverse party fraudulently to defeat federal jurisdiction." *Aguayo*, 59 F. Supp. 3d at 1249. To establish that a non-diverse party was fraudulently joined, the defendant has the burden of demonstrating the "inability of the plaintiff to establish a cause of action against the non-diverse party in state court." *Dutcher v. Matheson*, 733 F.3d 980, 984 (10th Cir. 2013); *Edison Ranch, Inc. v. Mosaic Potash Carlsbad, Inc.*, No. CIV 17-0790 JB/CG, 2018 WL 582578, at *10 (D.N.M. Jan. 26, 2018). "The ultimate question is whether there is arguably a *reasonable basis* for predicting that state law might impose liability on the facts involved. *Daniel v. Loya*, 304 F.R.D. 617, 628–29 (D.N.M. 2015).

---

[2] Pursuant to §1446(b)(2)(a), "[w]hen a civil action is removed solely under section 1441(a), all defendants who have been properly joined and served must join in or consent to the removal of the action." After the notice of removal is filed, all state-court proceedings are automatically stayed, and the other defendants in the case -- if not all defendants joined in the removal—have thirty days to consent to the removal of the action. See 28 U.S.C. § 1446(b)(2). Defendant Siegel filed his Notice of Removal on April 14, 2022. The other parties to the litigation were served via email and electronically through the CM/ECF system on the same day.

The party asserting fraudulent joinder bears the burden of proof, *Montano*, 211 F.3d 1278 (10th Cir. 2000), and in evaluating a claim of fraudulent joinder, "all doubts are to be resolved against removal," *Fajen v. Found. Reserve Ins. Co.*, 683 F.2d 331, 333 (10th Cir. 1982). In other words, the removing party "bears a heavy burden of proving fraudulent joinder, and all factual and legal issues must be resolved in favor of the plaintiff." *Dutcher*, 733 F.3d at 988

    C.    <u>Bad Faith Exception</u>:

28 U.SC. §1446(b)(3) is an exception to the one-year time limit for removals. Under that provision, a case may not be removed on the basis of jurisdiction conferred by §1332 "more than one year after commencement of the action, unless the district court finds that the plaintiff has acted in bad faith in order to prevent a defendant from removing the action." 28 U.S.C. §1446(c)(1). A plaintiff's "bad faith" can manifest itself in either of the two requirements for diversity jurisdiction: (i) a plaintiff can name or retain nondiverse parties or forum citizen defendants to defeat complete diversity or the forum- defendant rule, respectively; or (ii) it can obfuscate the quantity of damages it seeks for the purpose of defeating the amount-in-controversy requirement." *Aguayo v. AMCO Ins. Co.*, 59 F.Supp.3d 1225, 1261 (D.N.M. 2014) (Browning, J.); *McDaniel v. Loya*, 304 F.R.D. 617, 636 (D.N.M. 2015) (Browning, J.). In *McDaniel*, the court suggested that "bad faith" can be indicated in several ways, such as: (1) whether the plaintiff pursued active litigation against the "removal spoiler" in state court; or (2) evidence that plaintiff, despite active litigation against the removal spoiler, would not have named the removal spoiler or would have dropped the spoiler before the one-year mark but for the plaintiff's desire to keep the case in state court. *Aguayo*, 59 F.Supp.3d at 1261 (D.N.M. 2014).[3]

---

[3] The court noted in *McDaniel* that the text of §1446(c) provided no description of "bad faith" and that no court had "attempted to comprehensively define it." 304 F.R.D. at 635–36. Thus, in both *McDaniel* and *Aguayo,* the district

**DISCUSSION**

The current complaint identifies Joseph Pouges as a security guard at Siegel Suites Tammy Kimball as a General Manager and both as New Mexican residents. Doc. 1-4, ¶¶8-11. Kimball was named as a Defendant in the original complaint, which was filed December 6, 2019. Doc. 1-2.[4] Pouges was added as a party when the first amended complaint was filed on October 8, 2021. Doc. 1-4. Defendant Siegel was also added as a party at that time and on April 14, 2022, Siegel's attorney removed the state court case to federal court.

Plaintiffs contend that this Court lacks jurisdiction over the case because complete diversity is not present. Responses filed separately by Stephen Seigel ("Siegel") and The Siegel Group both take the position that the case is removable to federal court because Defendants Kimball and Pouges have been fraudulently joined. They also argue that the addition of Kimball and Pouges as parties cannot support removal under the "bad faith" exception to removal under 28 U.S.C. §1446(c)(1). The "bad faith" exception allows a case to be removed to federal court outside of the one-year time period when a plaintiff has not actively litigated against a "removal spoiler" in state court.

**I.      Fraudulent Joinder**

The complaint alleges that Sallyann was allegedly beaten to death on the premises of Siegel Suites and that Defendants' negligence and recklessness caused her death. Count I appears to assert a claim brought under premises liability, alleging that Defendants "had a duty to exercise ordinary care in keeping the premises of Sigel [sic] Suites Albuquerque reasonably safe

---

court staked out "its own definition" of "bad faith," relying in part on the legislative history behind the Federal Courts Jurisdiction and Venue Clarification Act of 2011, Pub.L. No. 112–63, 125 Stat. 760, 762 ("JVCA") which was became effective on January 6, 2012. The court also looked to the legislative history as well to determine that the provision was procedural rather than jurisdictional, but that conclusion is irrelevant to the Court's task at hand here, given the circumstances.

[4] Because Kimball was added as a party earlier than Pouges, the Court includes allegations from the original complaint, *see* discussion below, when considering Plaintiff's claims against Ms. Kimball.

for guests, which included adequate apportionment/approval of security related budgets given the high rates of criminality on Siegel Suites Albuquerque's premises." Doc. 1-4, ¶43.

Defendants say they do not agree that this is a premises liability case, but rather it's a domestic violence case, and that they cannot be liable for any of Plaintiff's claims because they did not control the activity that occurred inside Sallyann's home, nor did they ratify such activity. *See* Doc. 9 at 3 ("This is not a case of premises liability, but one of domestic violence between Ms. Ulibarri and Mr. Johnson."); *see also* Doc. 9 at 7 (citing *Schmidt v. Int'l Playthings, LLC*, 503 F.Supp.3d 1060 (D.N.M. 2020) (defendant store manager not liable under products liability theory for injury that occurred inside the home).  Defendants' argument is off-focus: Plaintiffs do not allege that Defendants caused Sallyann's injuries and eventual death by battering Sallyann (the domestic violence element of the case), but rather that Defendants were derelict in their duties to keep the premises reasonably safe from harm that could foreseeably occur on the premises. Put another way, the complaint spotlights the alleged failure of Defendants to ensure that the Siegel Suites premises was reasonably safe so that third parties with criminal or dangerous intent—such as Orlando—would be dissuaded from coming around to the premises.

Defendants cloud the issues even further by suggesting that Plaintiffs' assertion of a negligence claim violates Sallyann's Fourth Amendment right to privacy in her home. *See* Doc. 9 at 6. As Plaintiffs observe, that argument has no merit: the Fourth Amendment applies to governmental actions, not actions by private citizens invited into one's home. *See State v. Johnson*, 1989-NMCA-063, ¶10, 108 N.M. 778, 779 P.2d 556. Nor does Sallyann's right to privacy in her home preclude her personal representative from asserting her rights under state common law.

A.      Relevant Law

The question here is whether there is a reasonable basis to predict that liability might be imposed under New Mexico state law on the facts alleged in the complaint. Have Plaintiffs asserted a cause of action against Kimball and Pouges in that they owed a duty to keep Sallyann safe from a third party whom she invited into her home and if so, was harm foreseeable as a result of neglecting that duty?  Did they allegedly neglect that duty which then resulted in Sallyann's death? *See Zamora v. St. Vincent Hosp.*, 2014-NMSC-035, ¶ 22, 335 P.3d 1243;*see also Reichert*, 1994-NMSC-056, ¶ 11 (recognizing a New Mexico common-law cause of action for the "negligent failure to protect patrons from foreseeable harm" caused by a third party).

Under New Mexico law, all owners/operators of buildings in New Mexico have an affirmative duty to exercise ordinary care to keep their premises "safe for use" by visitors. *See* UJI 13-1309 NMRA. In 1994, the New Mexico Supreme Court ruled that this duty requires building owners/operators to protect all visitors from any "foreseeable harm [caused by a third party] regardless of whether that harm results from intentional or negligent conduct." *Reichert v. Atler*, 1994-NMSC-056, ¶ 11, 117 N.M. 623, 875 P.2d 379. This rule requires building owners/operators to implement security measures on their premises to adequately address the potential risk to visitors posed by third parties, including intentional violence. *See id.* ¶¶ 3-4, 1.

Further, under New Mexico law, an employee may be held individually liable for breaching his or her "corporate duties" and injuring a third party. *Stinson v. Berry*, 1997-NMCA-076, ¶ 2, 123 N.M. 482, 943 P.2d 129 (in wrongful death case, finding corporate manager "liable to third persons injured by their own tortious conduct regardless of whether they acted on behalf of the corporation and regardless of whether the corporation is also liable"); *see Dutcher,* 733 F.3d at 989 (agent is subject to liability to third party harmed by agent's tortious conduct).

Unless an applicable statute provides otherwise, "an actor remains subject to liability although the actor acts as an agent or an employee, with actual or apparent authority, or within the scope of employment.") (citing Restatement (Third) of Agency, §7.01)).[5]

    B.    Analysis

    *1.    Duty*

As the general manager of Siegel Suites Albuquerque, Defendant Kimball, by her own admission, had duties to ensure that Siegel Suites Albuquerque was reasonably safe for tenants, to identify security issues, to take action if any security issues were identified, to enforce security policies at the property, to monitor security cameras, to hire qualified security officers, to competently train security officers, and to supervise security officers to make sure they are safely performing their job duties. Doc. 5 (Kimball Depo) at 20:7 – 21:11, 20:13-15, 21:15-17, 40:6-15, 43:15-21, 50:14-18, 50:23-25, 60:7-11, 64:22–65:2, 81:9-12, 103:18-22, 110:15-24).

In her deposition, Ms. Kimball also described the duties belonging to the security officers she hired: duties to observe and report illegal drug use, observe and report any kind of physical violence, and observe and report all instances of domestic violence. (Ex. 3, Kimball Depo. at 67:18-20 – 68:1).[6] Thus, the record at this stage supports Plaintiffs' allegations in the complaint that both Kimball and Pouges had duties related to the provision of security at Siegel Suites.

    *2.    Breach*

---

[5] Defendants incorrectly base their fraudulent joinder argument on Texas law, under which employees like Kimball and Pouges would not have an "individual duty" that was separate and apart from their duties as employees. *Allen v. Wal-Mart Stores, LLC*, 2017 U.S. Dist. LEXIS 36011 (S.D. Tex. 2017) (interpreting Texas law). The Court declines to consider that case because New Mexico law applies in this case. *See Armijo v. Ex Cam, Inc*. 843 F.2d 406 (10th Cir. 1988) (federal courts are required to apply the law of the forum state in a diversity action).

[6] Defense counsel's efforts to distance themselves from a premises liability theory strike the Court as particularly odd based on Kimball's admissions in her deposition that a security officer at Siegel Suites "has a duty to observe and report all instances of domestic violence. . . ." Doc. 5 at 47 (page 67:18-25 to page 68:1).

The complaint goes on to assert that these Defendants breached those duties, specifically that both Kimball and Pouges were aware of criminal activity and the unsafe environment at the apartment complex, including activity directed at Sallyann—yet did nothing:

- Despite Defendants' knowledge of the high rate of crime at Siegel Suites Albuquerque, Defendants did not implement reasonable security standards to prevent these crimes, and did not hire designated trained individuals to conduct continuous monitoring of the security cameras to promptly and timely identify suspicious activity and send security guards as well as promptly notify police authorities to prevent the commission of crimes. Doc. 1-4, ¶31;

- During Sallyann Ulibarri's approximate four-week stay, Defendants were expressly ware of domestic disturbances caused by Orlando Johnson against Sallyann Ulibarri that occurred on the premises of Siegel Suites Albuquerque. Doc. 1-2, ¶31;

- Orland Johnson disturbed and disrupted other tenants of Siegel Suites Albuquerque, which included threatening gestures, language and associated behavior, requiring intervention of hotel/apartment facility staff." Doc. 1-2, ¶33;

- Management at Siegel Suites Albuquerque, including Defendant Tammy Kimball, also noticed that Sallyann Ulibarri was developing fresh bruising, cuts and associated injuries at the hands of Orlando Johnson." Doc. 1-2, ¶32; Doc. 1-4, ¶36;

- Defendants knew that Siegel Suites Albuquerque had high rates of criminal activity that threatened guest safety." Doc. 1-2, ¶39;

- Defendants knew that Orlando Johnson posed a threat to Sallyann Ulibarri's safety." Doc. 1-2, ¶40.

Defendant Pouges' addition as a party adds another wrinkle to the description of the security measures provided at Siegel Suites. The current complaint alleges that Pouges violated his duty by:

a. Selling methamphetamines from his rented apartment while both a tenant and employee of Siegel Suites Albuquerque;

b. Smoking marijuana while "on the clock" as an employee of Sigel [sic] Suites Albuquerque when he should have been provide security-related services;

c. Drinking alcohol while "on the clock" as an employee of Siegel Suites Albuquerque when he should have been providing security-related services,

      d.      Advising that individuals on Siegel Suites Albuquerque's premises, such as Orland Johnson, subvert implemented security measures to avoid detection (such as avoiding cameras); and

      e.      Ignoring a known risk of physical violence to Sallyann Ulibarri posed by Orland Johnson.

Doc. 1-4 (Am. Compl.), ¶45 (a-e).

Finally, the complaint alleges that the above-described breaches by Kimball and Pouges were a cause of Sallyann's wrongful death:

- Defendants collectively failed to properly assess the security risk and advise of the need for additional security measures, especially in light of the fact that existing levels of security had failed to curb criminal activity at the Siegel Suites Albuquerque;

- Had Defendants implemented 24-hour real time monitoring of its video cameras, implemented security patrol measure, trained the hotel/apartment employees and increased the frequency of patrols by staff and security at its facility of public places, then the Siegel Defendants would have seen and/or heard the perpetrator of Sallyann Ulibarri's assault before he harmed and eventually killed her;

- There was a reasonable probability that if Defendants had complied with reasonable care and security standards given the criminal history of the property and surrounding parking lot, then its reputation as a place for criminal opportunity would have been reversed, and thus averting the likelihood of criminals seeking the property as an easy place to commit criminal activity.

Doc. 1-4, ¶¶50-52.

Based on these allegations in the complaint (including the current complaint), the Court cannot find that Kimball and Pouges were joined fraudulently; therefore, Defendants have not met their burden of demonstrating fraudulent joinder.[7] Kimball and Pouges remain non-diverse defendants, destroying complete diversity in the case.

### III.    Bad Faith Exception

Plaintiffs contend the bad faith exception under §1446(c)(1) does not apply here because Defendants cannot show that non-diverse defendants Kimball and Pouges were named in bad

---

[7] The Court finds it sufficient to focus on the negligence claim when determining whether this case should be remanded without needing to proceed further into an analysis of the legal theories presented in the other claims.

faith. "Bad faith" in this context relates to a plaintiff's asserting and maintaining claims against a removal spoiler past the on-year mark to defeat removal. *Aguayo,* 59 F.Supp.3d at 1261.

A court weighing removal pursuant to 28 U.S.C. § 1446(c)(1) engages in a two-step analysis. First, the court weighs whether the plaintiff actively litigated against the removal spoiler in state court by asserting valid claims, taking discovery, negotiating settlement, seeking default judgment where defendant failed to answer the complaint, et cetera. *Id*. at 1262-1263. Active litigation by plaintiff against the removal spoiler creates a rebuttable presumption of good faith; however, failure to actively litigate evinces bad faith. *Id*. Second, a defendant may rebut this presumption by showing that even though plaintiff engaged in active litigation against defendant, the removal spoiler would not have been named, or would have been dropped prior to the one-year mark, but for plaintiff's desire to keep the case in state court. *Id*.

If a defendant "wants the removal to stick," then he or she should be able to show either: (i) that the plaintiff did not litigate at all, or engaged in a mere scintilla of litigation against the removal spoiler; or (ii) that the defendant has strong, unambiguous evidence of the plaintiff's subjective intent, for which the plaintiff cannot offer any plausible alternative explanation." *Id.* at 1277.

A. <u>Defendant Kimball</u>

The Court finds that Plaintiffs have actively litigated against Defendant Kimball in this lawsuit, and agrees with Plaintiffs that Kimball's role in this litigation is central based on her role as general manager of Siegel Suites. Plaintiffs list Kimball's direct involvement in the discovery process:

1. Sitting for her deposition for roughly seven hours (*see* Kimball Depo., Doc. 5);

2. Kimball's verification of the completeness and accuracy of written discovery responses pertaining to security-related issues at Siegel Suites Albuquerque (Doc. 5 at 33); and

3.  Attending a Rule 1-034 NMRA site inspection at Siegel Suites Albuquerque and personally escorting Plaintiffs' counsel and their two expert witnesses around the premises, including common areas, Ms. Ulibarri's apartment, and Defendant Kimball's personal office where she is responsible for monitoring surveillance video (*see* Doc. 9-1).

Ms. Kimball's involvement in the case amounts to more than a "mere scintilla of litigation" and as such, is sufficient to create a rebuttable presumption of good faith. Defendants offer nothing that adequately challenges that presumption. They claim that Plaintiffs delayed taking Kimball's deposition for a year and half—but do not dispute that her deposition was in fact taken and that she was questioned extensively over the course of seven hours. Defendants downplay the significance of Kimball's involvement in the verification of discovery responses, but concede that Kimball did in fact have a personal role in gathering responsive information in the discovery process. Defendants claim that Kimball's "attendance" at the Rule 1-034 NMRA site inspection is inaccurate and irrelevant, but they do not challenge Kimball's statement that she was present at the inspection. Kimball watched as the computer in her office that displays security camera footage was being inspected; she walked Plaintiffs' counsel and his experts to Sallyann's former apartment to grant them access because she had the key; she waited until the experts were done taking photographs; and then closed and assured the door was locked before returning to her office. Doc. 9-1, ¶9.

Finally, Plaintiffs claim that Kimball participated in a mediation to negotiate the resolution of the claims asserted against her, but Defendants contend that this did not happen. *See* Doc. 9-1, ¶10 (Kimball's statement that she "did not attend or otherwise participate in mediation for this lawsuit"). The Court finds it somewhat troubling that in their reply, Plaintiffs recant their statement regarding Kimball's participation in mediation, explaining that she was ordered to do so in the state court's scheduling order directing her to attend. Doc. 13 at 13. At

the same time, it is also somewhat troubling that Kimball decided to violate a court order by failing to attend, and so viewing the circumstances as a whole, Defendants have not sufficiently shown that Kimball was added as a party in bad faith.

B.  Defendant Pouges

As mentioned previously, Defendant Pouges was added as a party on October 8, 2021 pursuant to a state court order granting Plaintiff's request to amend. Doc. 1-4. The state court also granted Plaintiffs' motion to serve Pouges by publication on March 30, 2022.

Plaintiffs state that they intend to pursue written discovery and take Pouges' deposition as soon as they are able to do so. Defendants point out that Plaintiffs have not yet been able to depose Pouges, or serve him with any discovery requests. However, this failure cannot fairly be attributed to Plaintiffs, but rather to the Court's order which delayed entering a scheduling order pending resolution of the instant motions. Doc. 8. Moreover, Defendants offer no evidence of a bad faith subjective intent on the part of Plaintiffs, particularly when Plaintiffs named Kimball (also a non-diverse defendant) in the original complaint.

Defendants insist that neither Defendants Kimball nor Pouges are critical to recovery in this matter because neither have the ultimate responsibility of security on the property. However, they overlook the fact Kimball and Pouges—not the corporate and regional employees—were involved in the daily management and security responsibilities at Siegel Suites and Plaintiffs have made assertions against these individuals that they were both derelict in carrying out those responsibilities.

Despite the bad faith exception under §1446(c)(1), the one-year limitation for removal of actions still exists. *Aguayo*, 59 F. Supp. 3d at 1281 ("The one-year limitation still exists—Congress merely crafted an exception to it—and the Court must not construe the bad-faith

exception so broadly as to read the one-year limitation out of existence."). Defendants have not shown that non-diverse Defendants Kimball and Pouges were added as parties to this case to defeat diversity.

## CONCLUSION

In sum, the Court finds and concludes that:

(1)  Plaintiffs are able to establish a cause of action against non-diverse Defendants Kimball and Pouges under New Mexico law and therefore Defendants cannot meet the "heavy burden" of clearing the "high hurdle" of proving fraudulent joinder;

(2) Defendants have failed to prove "bad faith" under the exception to the one-year time limit for removal under §1446(c)(1) as to both Defendants Kimball and Pouges; and

(3) Because both Kimball and Pouges are non-diverse defendants, complete diversity is not present in this case and this Court lacks subject-matter jurisdiction.

**IT IS THEREFORE ORDERED** that Plaintiffs' Motion to Remand **(Doc. 5)** is hereby GRANTED for reasons stated in this Memorandum Opinion and Order.

 **IT IS FURTHER ORDERED** that the Clerk of Court shall take the necessary actions to remand this case to the First Judicial District Court, State of New Mexico.

_____
WILLIAM P. JOHNSON
CHIEF UNITED STATES DISTRICT JUDGE